## CONN v. SOUTHWESTERN SETTLEMENT & DEVELOPMENT CO. et al. (No. 526.)

(Court of Civil Appeals of Texas. Beaumont. May 4, 1920.)

**1. Names ⚷16(3) — Sam J. Whitney and Samuel J. Withey held not idem sonans.**

Deed describing land as the "Sam J. Whitney survey" *held* insufficient to vest grantee with title to land in the "Samuel J. Withey survey," as against subsequent innocent purchaser for value from grantor; such names not being idem sonans.

**2. Vendor and purchaser ⚷236—To be protected as bona fide purchaser, purchaser must pay value.**

To be protected as a bona fide purchaser, purchaser must have paid value for the land.

**3. Adverse possession ⚷115(1) — Evidence held to raise issue as to who matured title by limitations.**

In an action of trespass to try title to recover the title and possession of land, evidence *held* to raise an issue as to whether defendant's remote grantor or intervener's testator's grantor matured limitation title.

**4. Appeal and error ⚷1011(1)—Finding on conflicting evidence not disturbed.**

Where the evidence was sufficient to clearly raise an issue of fact, court's finding thereon will not be disturbed on appeal.

Error from District Court, Orange County; W. T. Davis, Judge.

Suit by the Southwestern Settlement & Development Company and others against A. L. Ponder and others, in which Mrs. S. N. Conn intervened, and in which named defendant interposed cross-action against intervener. Judgment for named defendant against intervener, and she brings error. Affirmed.

Warren & Conn, of Houston, for plaintiff in error.

Kennerly, Williams, Lee & Hill, of Houston, John Hancock, of Thurber, and Smith & Crawford, of Beaumont, for defendants in error.

WALKER, J. This suit was instituted by the Southwestern Settlement & Development Company and others, as plaintiffs, against Amos L. Ponder and others, as defendants, in an action of trespass to try title to recover the title and possession of the Samuel J. Withey survey in Orange county, Tex. As sole devisee and independent executrix of the estate of R. C. Conn, deceased, Mrs. S. N. Conn made herself a party to this suit. Amos L. Ponder answered by a cross-action against Mrs. Conn, claiming to own the southwest one-fourth of this survey. She answered this cross-action, as cross-defendant. The case was tried on the following agreement:

"Come now the parties here by and through their attorneys of record, and agree that the plaintiffs herein own all of the S. J. Withey survey in Orange county, Texas (described in the pleadings of the parties herein) unless the defendants or some one or more of them have acquired title to said survey or a part thereof under the statutes of limitation of this state."

All the matters in controversy were settled by agreement, except the contest between Ponder and Mrs. Conn over the southwest one-fourth. This was tried by the court without a jury, and judgment was rendered for Amos L. Ponder against Mrs. Conn for the title and possession of the said southwest one-fourth. From this judgment she has duly perfected her appeal by writ of error.

In our discussion of this case we will refer to Mrs. Conn as appellant, and to Amos L. Ponder as appellee.

On motion of appellant, the trial court filed the following conclusions of fact:

"1. That the land in controversy, being the southwest one-fourth (¼) of the Samuel J. Withey survey, in Orange county, Texas, was known throughout all of the period of the transactions before the court in this cause by all of the parties dealing therewith and by the public generally as the Jack Ballard survey of 160 acres.

"2. That the land in controversy was pat-

⚷For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ented by the state of Texas to Samuel J. Withey on April 3, A. D. 1841.

"3. That in the year 1894 Ben Hollis purchased the southwest one-fourth of the Samuel J. Withey survey known as the Jack Ballard 160-acre survey, and immediately moved his family onto the same; there being a good house and 15 or 20 acres of land in a state of cultivation on said survey.

"4. That Ben Hollis resided upon said land, claiming, cultivating, using, and enjoying the same from the date he purchased the same until about November, A. D. 1895, when he sold the same to Jesse Gentry, Sr., which sale was subsequently evidenced by a conveyance executed Ben Hollis and wife to Jesse Gentry, Sr., dated July 26, A. D. 1906.

"5. That Jesse Gentry, Sr., resided upon, cultivated, used, and enjoyed said land, claiming the same from November, 1895, to and including the year 1908, when he conveyed the same to his son, Jesse Gentry, Jr.

"6. That after 1908 up to 1916 the said Jesse Gentry, Sr., continued to reside upon said land, cultivating, using, and enjoying the same, believing the same to be his property, but in the name of his son, Jesse.

"7. That during the period from 1895 to 1916 the said Jesse Gentry, Sr., paid all taxes due on the land in controversy.

"8. That on September 26, 1908, Jesse Gentry, Sr., conveyed the Withey survey to Jesse Gentry, Jr., which deed was filed on the same day.

"9. That on December 15, 1908, Jesse Gentry, Jr., conveyed the Sam J. Whitney section No. 11 to W. H. Gentry, which deed was filed for record October 15, 1914.

"10. That on September 21, 1911, Jesse Gentry, Jr., by his duly authorized attorney, Leslie B. Ponder, conveyed to Amos L. Ponder the southwest one-fourth of Samuel J. Withey survey. This deed was first filed for record September 22, 1911, and recorded in Book 9, page 304, Deed Records of Orange County, Texas, at which time the same was not acknowledged. Subsequently this deed was properly acknowledged, and again filed for record on May 10, 1918, and recorded in Book 28, page 21, Deed Records of Orange County, Texas.

"11. That the said Amos L. Ponder paid the sum of $2,000 for said land, and made inquiry at the time of the clerk of the county court of Orange county, Texas, who informed him that the records of his office showed the title to said land to be in Jesse Gentry, Jr.

"12. That the said Amos L. Ponder was an innocent purchaser for value and without notice of the said deed from Jesse Gentry, Jr., to W. H. Gentry, dated December 15, 1908, and knew nothing of the claim of said W. H. Gentry or any other person, to said land.

"13. That during the year 1911, the said W. H. Gentry resided at Vidor, Texas, and not upon the land in controversy. During said year Jesse Gentry, Sr., and a Mr. Chapman, who was a tenant of Jesse Gentry, Sr., were the only ones residing upon said land.

"14. That during 1912, and subsequent thereto, W. H. Gentry resided upon the northeast one-fourth of the S. J. Withey survey, and has not been in possession of any portion of the southwest one-fourth of the Withey survey.

"15. That during a portion of the time prior to 1908, the said W. H. Gentry lived with his father, Jesse Gentry, Sr., on this land. During this time he was a member of his father's family, and made no claim as against his father to any portion of this land.

"16. That from the year 1906 to 1909, inclusive, W. H. Gentry was away from said land and had no tenant on the same.

"17. That on January 28, 1913, by deed filed March 4, 1913, W. H. Gentry conveyed to R. C. Conn the land in controversy. The only consideration paid for this conveyance was a load of wire fencing which was to be used in building a fence on said land, which was for the use and benefit of R. C. Conn.

"18. That on August 15, 1913, by deed filed August 27, 1913, W. H. Gentry conveyed to R. C. Conn the entire S. J. Withey survey of 640 acres, less the land of the northeast one-fourth. The only consideration paid for this conveyance was $100.

"19. That the deed offered in evidence from Jesse Gentry, Sr., to W. H. Gentry, purporting to convey the Withey survey dated August 12, 1913, and filed for record August 27, 1913, was not executed by Jesse Gentry, Sr., nor under or by virtue of his authority or consent.

"20. That the S. J. Withey survey would cut 4,000 feet of pine timber per acre, and the southwest one-fourth of said survey would cut 300,000 feet of pine timber valued at $2.50 per thousand in 1913, and the land was valued at $2 per acre."

[1, 2] From these conclusions of fact, it results that judgment was properly rendered for Amos L. Ponder for two reasons: First. Because the deed from Jesse Gentry, Jr., to W. H. Gentry, dated December 15, 1908, conveyed the Sam J. Whitney survey, and not the Samuel J. Withey survey. These names are not idem sonans, and there was no testimony in the record that the Withey was commonly or generally known as the Whitney survey, nor is there any testimony that any of the parties to this suit so recognized it. Had this deed been of record, it would not have been notice to Amos L. Ponder when he purchased from Jesse Gentry, Jr., in 1911. Second. Because the deed from W. H. Gentry to R. C. Conn, of date January 28, 1913, was without consideration. Under the rule announced in White v. McGregor, 92 Tex. 556, 50 S. W. 564, 71 Am. St. Rep. 875, as between W. H. Gentry and Amos L. Ponder, Ponder acquired the superior title. Then, in order to defeat the Ponder title, a subsequent purchaser under W. H. Gentry must pay value. On this issue the judgment of the trial court was against Mrs. Conn and in favor of Ponder.

However, by her third assignment of error, she challenges the court's conclusions of fact that Jesse Gentry, Sr., acquired title to this land by limitation, asserting that this limitation title matured in W. H. Gentry, and that Jesse Gentry, Sr., never had any interest in it. In favor of the title of Jesse Gentry, Sr., his daughter, Mrs. Alice McGee, testified as follows:

"My name is Mrs. Alice McGee. Jesse Gentry, Sr., is my father. I have been married, Mack McGee was my husband. He is not my husband now. I am now a single woman. I was single for a year before I was served with citation here in this suit. I was a single woman at that time. I know where the Samuel J. Withey survey in this county is. I used to live there. I said I know where that survey of land is. I lived on it at one time; that was our old home once. When I say 'our' I mean when I lived with my father. We called that land at that time the Jack Ballard place. The part we bought for the Jack Ballard was 160 acres. As to whether or not that was the southwest quarter of the Withey survey, will say it was right near the Jasper county line, on the Orange county north line.

"I said my father, and his family moved on this land in August, 1895; that is, on the Jack Ballard 160 acres. Ben Hollis was living there when we moved there. We moved into the house with him. We bought it from him. My father bought the place from Mr. Hollis. He traded him some oxen for it. That was in August, 1895. Mr. Hollis was living there on the place at that time. We lived there in the house with him a week or more before he ever moved out. My father claimed 160 acres of land there then. The house on that land was a log house with a plank room on the back and a front gallery and back gallery. There were two fields on the land, one by the house and one northeast of the house. I don't know how many acres were in cultivation in all. There must have been about 30 acres in the two fields. In about a week after we moved there, Mr. Hollis moved away. I don't remember just how long it was, but it was a week, I am sure, before he moved away. We lived there a long time. My father continued to live there all the time. He never did move away from there until they sorter moved him away, which was year before last now. He cultivated those fields there around the house; they farmed there every year; he helped; he didn't do it all. My father never moved away from that place at all from the time he moved there until year before last. He would go off and come back. He left his things there; he never did give the place up. They cultivated these fields right straight along every year; they never did lay out as I know of."

"I know who those oxen belonged to that were traded for this place. My father had a big old yoke of steers, and they ran off of a bridge, and he traded them for another yoke, and traded them for the place. The oxen belonged to my father that were traded for this place. My father had control of that property after we moved down there in 1895. I did the most of the superintending, and my father did the providing. Hamp did not stay there all the time. He worked off some. He never worked much in the crop. My husband and my father built the house that he said he built."

Jesse Gentry, Sr., testified by deposition as follows:

"My name is Jesse Gentry. I will be 80 years of age on the 10th of May, 1917. I first moved on my present Texas home about 22 years ago. To the best of my recollection it was in October or November, 1895, that I first moved on the land now occupied by me as my home in Texas.

"Int. 5. Please state whether or not you purchased any land in the Samuel Withey survey in Orange county where you now reside in Texas, and, if so, from whom you purchased the same. A. Yes; I purchased 160 acres of land from one Ben Hollis in the Samuel Withey survey in Orange county, Tex."

In answer to the sixth, tenth, eleventh direct interrogatories and the thirteenth and nineteenth cross-interrogatories, he testified as follows:

"There was a good double log house on the land when I bought it, and I built a barn, cleared about 30 acres of land and fenced and cultivated it, and cut three ditches a year ago this spring. I also reset all the fencing, putting in new rails where necessary, about a year ago. I built the barn about the third or fourth year after I purchased the place, and did most of the clearing the first winter I was on the place. I was engaged in clearing the most of the first three winters that I was on the place. Yes, while I have resided upon, used, and cultivated and enjoyed the Samuel Withey survey in Orange county, Tex., I have claimed to own the same as my own property."

[3, 4] W. H. Gentry testified that he bought the land from Ben Hollis and gave Hollis a yoke of oxen in payment for it, and had always claimed the land and had lived on it. Ben Hollis testified that he sold the land to W. H. Gentry in 1895, Gentry being a minor at that time, that he sold it to him at the request of Jesse Gentry, Sr., and that W. H. Gentry gave him a yoke of oxen for the land. This testimony clearly raised an issue as to who matured the limitation title. The court having resolved this in favor of Jesse Gentry, Sr., we will not disturb it.

By her fourth assignment of error, appellant complains of the finding that R. C. Conn did not pay value for the deed made to him by W. H. Gentry, dated January 28, 1913. On the question of value, W. H. Gentry testified as follows:

"I don't recollect exactly what the consideration was for the deed from myself and wife to R. C. Conn for the southwest quarter, dated the 28th of January, 1913, reciting the consideration of $10 and other valuable considerations. I can't remember now how much money Mr. Conn paid me for that deed. I remember the circumstance of Mr. Conn buying some wire for me and shipping it up there. That was part of the consideration for that deed. The consideration was something like $300, I am pretty sure. One hundred dollars was the consideration for the deed from myself and wife to R. C. Conn for the entire section, excepting the northeast quarter. Mr. Conn paid me $100 for that deed.

"I don't really know how much Mr. Conn gave me for it. I sold it to him in order to get able to stay there to help me out in living. I made Mr. Conn the deeds; I borrowed money from him sometimes. I made him several deeds. I got the deed from my father on August

12th, and on the 15th of August I made Mr. Conn the last deed. I did not make that deed for the purpose of getting his title straightened out. Mr. Conn paid me $100 when I made him the last deed. It was before that that Mr. Conn sent me some wire up there. I know it was before that that he sent me the wire because I had a crop growing on my land at the time this last deed was made. I put some of that wire on the southwest quarter. It is scattered around there over this whole section; that is, where there is a field. I put some of this wire that Mr. Conn sent me down there on this identical land I sold to Mr. Conn, and it is there yet; I put some of it on the old place, on the southwest quarter. Mr. Conn gave me $100 for this last deed after I got a deed from my father. He paid that to me in money, and I gave my father $50 of that. Mr. Conn gave me that $100 for this deed that I made him in August, 1913, and I gave my father $50 of it; he was talking about going to Alabama then, and he didn't go. During the time I was making these transactions, I thought my title to this land was questionable, but I had bought it, and I thought it would be mine some time if I ever got it cleared up.

"Mr. Conn shipped to me the net wire, and we had been talking about it in the spring of 1913. Prior to that time I had executed to him deeds to the northwest one-fourth, the northeast one-fourth, and the southeast one-fourth. I reserved to myself the land on the northeast one-fourth.

"Q. These various deeds that Mr. Conn had obtained from you for the quarter sections—state whether or not he had paid you for those deeds. A. Yes, sir; he paid me for the deeds. He paid me for each deed that be obtained from me. At the time I executed to him the deed for the entire section after I had obtained the deed from the old man, Mr. Conn owned by deeds from me the entire section of land except the land in the northeast quarter, and that is the time he paid me the $100. When the old man told me to sign his name to that deed in the presence of these witnesses Burrell and Wright, Burrell and Wright and myself went to the Jasper county line and met Preston Bond there, and had Preston Bond to take the acknowledgment of the witness Wright. We went about 400 yards from the house up to the county line. Preston Bond was a notary in Jasper county."

He also testified that he could not tell exactly what consideration was paid him for the land. He estimated it at about $300. In view of the fact that the trial court found him guilty of forgery, in that he forged the deed from his father, dated August 12, 1913, his testimony was not conclusive. As he was thoroughly discredited by the findings of the trial court, we cannot disturb the conclusion that no value was paid to him for the deed of date January 23, 1913.

Our discussion of this case has disposed of all the legal propositions raised under the other assignments. As we find no error in this record, the judgment of the trial court is in all things affirmed.